1
2
3
4
5
6
7
8
9
10
11
12

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:13-cr-00295-GMN-PAL |
| Plaintiff, | REPORT OF FINDINGS AND RECOMMENDATION |
| v. | |
| KEVIN BANG WINN, | (Mtn to Dismiss – Dkt. #32) |
| Defendant. | |

13   This matter is before the court on Defendant Kevin Bang Winn's ("Winn") Motion to

14   Dismiss Indictment (Dkt. #32).  This matter was referred to the undersigned for findings and

15   recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4.  The court has considered

16   the Motion, the government's Opposition (Dkt. #33), Winn's Reply (Dkt. #34), and the

17   government's Supplement (Dkt. #35).

18                                    **BACKGROUND**

19   On July 31, 2013, a federal grand jury returned an Indictment (Dkt. #1) against Winn,

20   charging him with eleven counts of Health Care Fraud – Medicare in violation of 18 U.S.C.

21   § 1347.  The Indictment alleges that between March 2006 and August 2008, Winn knowingly

22   and willfully executed and attempted to execute a scheme and artifice to defraud a healthcare

23   benefit program and to obtain by materially false and fraudulent pretenses, representations, and

24   promises, money owed by and under the custody of the federal Medicare program in connection

25   with the delivery of, and payment for, health care benefits, items, and services.  The scheme

26   allegedly involved fraudulently billing Medicare for durable medical equipment ("DME") which

27   was not provided to the patient and not medically necessary.

28   / / /

1

Specifically, the Indictment alleges that as part of the scheme, Winn operated Desert Medical Equipment ("Desert"), a durable medical supply company located in Las Vegas, Nevada.  Between March 2006 and August 2008, Medicare allegedly paid Desert $640,000 for DME Desert allegedly provided to its customers.  As part of the scheme, Winn allegedly (a) submitted and caused to be submitted fraudulent claims for DME that were never provided to Desert's customers; (b) submitted and caused to be submitted fraudulent claims for DME that were not medically necessary and had not been prescribed by a doctor; (c) forged or caused to be forged prescriptions and falsified or caused to be falsified certificates of medical necessity to make it appear as if a doctor had ordered a product for Desert's customers; and (d) paid or caused to be paid "marketers" in Southern California to obtain patients for Desert.  The marketers allegedly provided patients with money in exchange for the patients' Medicare information which was allegedly used to bill Medicare for items not provided.  The Indictment also contains two forfeiture allegations.

## DISCUSSION

I.   **The Parties' Positions.**

    A.   **Winn's Motion to Dismiss (Dkt. #32)**

In the Motion to Dismiss, Winn argues that he completely disassociated himself from the alleged conspiracy or any further unlawful acts relating to this case in June 2008.  As a result, he argues this case was filed outside the applicable statute of limitations and should be dismissed.  Healthcare fraud charges under 18 U.S.C. § 1347 carry a five-year statute of limitations under 18 U.S.C. § 3282.  Citing *Toussie v. United States*, 397 U.S. 112, 115 (1970), Winn argues that the statute of limitations generally begins to run when the crime is complete.  In a non-conspiracy case, the crime is complete when the last element of the crime has been satisfied.  In a conspiracy case, the statute of limitations is tolled upon the last act committed in furtherance of the conspiracy.  However, overt acts of concealment that occur after completion of the objectives of the conspiracy cannot delay running of the statute of limitations because conspiracies frequently involve attempts to conceal the acts involved.  In this case, Winn is not charged with conspiracy.

/ / /

1    Therefore, the healthcare fraud counts of the Indictment, which all occurred between 2005 and

2    the first half of 2008, are time-barred.

3        Winn argues that he left Las Vegas in approximately June 2008 after realizing he had a

4    gambling problem.  He returned to California and let his Las Vegas home go into foreclosure.

5    By July 2008, he was working as an IT specialist in California when Elegria Phankonsky, a

6    distant relative, continued to operate Desert in Winn's absence.  Winn claims he had no further

7    involvement or material contact with Ms. Phankonsky or Desert and no longer received monies

8    from the business after June 2008.  His motion is supported by an FBI interview of him on May

9    24, 2013, which is attached to the motion as Exhibit "A".  The attached FBI 302 indicates the

10   FBI obtained records from Winn's financial accounts and determined there was very little

11   activity in the relevant account from June 2008 until it was closed in August 2008 for being

12   overdrawn.  The 302 also relates what Winn told the FBI about realizing that he was developing

13   a gambling problem, that he did not enjoy the DME business, and that he decided in

14   approximately June 2008 to leave Las Vegas and return to California.

15       Winn contends that because he broke all ties with Ms. Phankonsky and Desert when he

16   left Las Vegas for California in June 2008, he "effectively ended his involvement with any

17   further violations of 18 U.S.C. § 1347."  The eleven counts in the Indictment were drafted in

18   such a way that the dates of the "payments" made by Medicare to Desert are used as the date of

19   the violation.  However, Winn argues that the "operative dates should be the dates during which

20   the alleged fraudulent requests for payment were submitted to Medicare."  If the dates of the

21   fraudulent submissions to Medicare are used, they all fall before July 31, 2008.  Because the

22   Indictment in this case was not returned until July 31, 2013, and the dates of the alleged

23   fraudulent submissions occurred before July 31, 2008, all of the crimes charged in the Indictment

24   are barred by the applicable five-year statute of limitations.

25       **B.    The Government's Opposition (Dkt. #33).**

26       The government opposes the motion, asserting that the gravamen of the Indictment is that

27   Winn fraudulently billed Medicare for items of DME which were not provided to patients and

28   which were not medically necessary.  The Indictment also alleges that Winn prepared, or caused

to be prepared, false paperwork "to make it appear as if the physician had ordered a product" for customers, and paid marketeers to solicit patient information used to bill Medicare for items not provided. The Indictment alleges Winn engaged in this scheme on eleven different occasions by submitting fraudulent claims for Medicare reimbursements. Medicaid paid these claims between November 27, 2007, and August 27, 2008. The United States acknowledges that 18 U.S.C. § 3282 establishes a five-year statute of limitation for the healthcare fraud counts charged in the Indictment. The government concedes that the way this Indictment was drafted is to reflect that the violations occurred on the date of the payments by Medicare to Desert. The government also concedes that pursuant to 18 U.S.C. § 1347, the operative dates should be the dates on which the alleged fraudulent request for payments were submitted to Medicare. The discovery provided in this case demonstrates that the claims related to counts six through nine were paid on August 6, 2008, and received on August 4, 2008. The claims related to counts ten and eleven were paid on August 27, 2008, and received by Medicare August 25, 2008. Thus, the crimes charged in counts six through eleven plainly fall within the applicable five-year statute of limitations.

With respect to counts one through five, the government concedes that they occurred more than five years prior to July 31, 2013, when the Indictment was returned. However, the government contends that they also occurred within the statute of limitations because they are part of a continuing offense. The healthcare fraud statute was modeled after the bank fraud statute, and every court that has addressed the issue has concluded that healthcare fraud is a continuing offense. Although the Ninth Circuit has not yet decided whether a healthcare fraud offense is a continuing offense, it has consistently held that bank fraud is a continuing offense. Under controlling Ninth Circuit authority, the crime of bank fraud is not complete until the entire scheme is completed. The government argues that because the healthcare fraud statute is modeled after the bank fraud statute, the crime of healthcare fraud is not completed until all of the fraudulent submissions to Medicare are made. The government contends that unlike the mail and wire fraud statutes, which punish each use of the mail or wire, the bank fraud statute punishes each execution of the overall scheme, citing *United States v. Molinaro*, 11 F. 3d. 853, 859 (9th Cir. 1993).

In this case, the last allegedly fraudulent claims were submitted within the statute of limitations, and therefore, the fraudulent submissions more than five years old are not time-barred.   Finally, the government contends that Winn's arguments about completely disassociating himself from Desert in June 2008 are factual disputes which the court may not address in a motion to dismiss the indictment.

### C.    Winn's Reply (Dkt. #34)

Winn's Reply concedes that this court could find that healthcare fraud is a continuing offense.   However, in this case, Winn is not charged with being a member of a conspiracy, and the government must therefore show that Winn himself committed the acts charged in the eleven counts of the Indictment.   The Indictment in this case charges each of the eleven offenses as a separate crime, and the government must therefore prove that Winn committed each offense. Even if the eleven offenses are related, Winn argues that "the issue still remains whether Winn committed any illegal act amounting to healthcare fraud after June 2008."   The problem with the government's continuing offense argument is that the government has not alleged a conspiracy in this case.   Counts one through five occurred outside the five-year statute of limitations.   Counts six through eight allegedly occurred within the five-year statute of limitations, but months after the offenses alleged in one through five, and only after "Winn was long gone."   Winn contends that the continuing offense doctrine "cannot save this Indictment because the issue of withdrawal still controls the outcome."

The Reply argues that the single factual question before the court in determining this motion to dismiss is when Winn ended his involvement with Desert.   The FBI reports indicate the FBI determined that by June 2008, Winn had moved from Las Vegas and ended his involvement.   Thus, counts six through eleven were committed by another individual after Winn was no longer involved at any level, and they must be dismissed.

### D.    The Government's Supplement (Dkt. #35).

The government filed a Supplement (Dkt. #35) "to facilitate the court's review of the parties' arguments and the Defendant's review of the evidence in this case."   The Supplement contains information provided by Noridian, the third-party administrator for Medicare,

concerning when each claim charged in the indictment was received by Medicare.  According to the government's Supplement, the claims charged in counts one through five were received by Noridian between November 21, 2007, and April 10, 2008.  The claims charged in counts six through eleven were received between August 3, 2008, and August 24, 2008.  In a footnote, the government states that because the claims were electronically submitted, "the date of receipt by Medicare is approximately equal to the date of the submission."  Supplement (Dkt. #35) at 2 n.1.

**II.    Applicable Law & Analysis.**

    **A.    Rule 12(b).**

Pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure, "Any defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion."  A motion to dismiss is generally capable of determination before trial "if it involves questions of law rather than fact."  *See United States v. Yip,* 248 F. Supp. 2d 970, 972 (D. Haw. 2003) (citing *United States v. Shortt Accountancy Corp.,* 785 F.2d 1448, 1452 (9th Cir.), *cert. denied,* 478 U.S. 1007 (1986)).  Generally, the court should not consider evidence appearing outside the four corners of the indictment and "must accept the facts alleged in that indictment as true."  *United States v. Ruiz-Castro,* 125 F. Supp. 2d 411, 413 (D. Haw. 2000) (citing *Winslow v. United States*, 216 F.2d 912, 913 (9th Cir. 1954), *cert. denied*, 349 U.S. 922 (1955)).  The indictment itself should be (1) read as a whole; (2) read to include facts which are necessarily implied; and (3) construed according to common sense.  *United States v. Blinder*, 10 F.3d 1468, 1471 (9th Cir. 1993) (citing *United States v. Buckley*, 689 F.2d 893, 899 (9th Cir. 1982), *cert. denied*, 460 U.S. 1086 (1983)).  The court's inquiry must end there.  Arguments directed at the merits of the claims must be left for trial.

The Ninth Circuit has instructed that Rule 12(b) motions are usually appropriate to consider legal issues such as double jeopardy, previous conviction or acquittal, statute of limitations, immunity, and jurisdiction.  *See United States v. Smith,* 866 F.2d 1092, 1096 n 3 (9th Cir.1989).  However, where the legal issues are "intermeshed with questions going to the merits," they should be determined at trial.  *See United States v. Nukida,* 8 F.3d at 670 (9th Cir.

/ / /

1   1993) (citing *United States v. Ayarza-Garcia,* 819 F.2d 1043, 1048 (11th Cir.), *cert. denied,* 484

2   U.S. 969 (1987)), *appeal after remand,* 87 F.3d 1324 (9th Cir. 1996).

3        In deciding pretrial motions to dismiss, the court may not "invade the province of the

4   ultimate finder of fact." *Id.* at 679.  Pretrial motions requiring the court to decide issues of fact

5   may only be decided if the fact determinations are "entirely severable from the evidence to be

6   presented at trial." *Id.*  Where the defendant's motion to dismiss is "substantially founded upon

7   and intertwined with" evidence concerning the alleged offense, the motion should be determined

8   by the ultimate finder of fact and must be deferred until trial.  *Id.*  A motion to dismiss the

9   indictment may not be used to conduct a "summary trial of the evidence."  *United States v.*

10  *Boren,* 278 F.3d 911, 914 (9th Cir. 2002) (citing *United States v. Jensen,* 93 F.3d 667, 669 (9th

11  Cir. 1996)).  As the Ninth Circuit explained, the Rule 12 cannot be used to determine general

12  issues of guilt or innocence, and helps ensure that the "respective provinces of the judge and jury

13  are respected." *Id.* at 669.

14       In *Nukida,* the defendant was charged with tampering with consumer products in

15  violation of 18 U.S.C. § 1365.  She filed a motion to dismiss the indictment in the district court,

16  arguing that: (a) her alleged conduct did not affect interstate commerce; (b) the charges in the

17  indictment failed to state an offense; and (c) the district court lacked subject matter jurisdiction

18  over the case.  *Id.* at 669.  The district court granted Nukida's motion and dismissed the

19  indictment pursuant to Rule 12(b).  *Id.* at 668-69.  The Ninth Circuit reversed, finding that the

20  district court exceeded its authority when it determined a material element of the offense charged

21  in the indictment, specifically, that the products allegedly tampered with did not then affect

22  interstate commerce.  This was a material element which should have been reserved for the

23  finder of fact at trial because "a motion to dismiss is not the proper way to determine a factual

24  defense." *Id.* at 669, 672 (citing *United States v. Snyder,* 428 F.3d 520, 522 (9th Cir.), *cert.*

25  *denied,* 400 U.S. 903 (1970), and *United States v. Smith,* 866 F.2d 1092, 1096 n.3 (9th Cir.

26  1989)).

27       For purposes of a pretrial motion to dismiss, the court should not consider evidence

28  outside the four corners of the indictment, and it must accept the facts alleged in the indictment

as true.  Whether, and if so, when Winn ceased any involvement in Desert and the fraudulent healthcare scheme alleged in the Indictment is a question of fact for the jury which may not be determined in a motion to dismiss.  However, Winn's statute of limitations arguments raise legal issues the court should consider in a motion to dismiss.

## B.    Statute of Limitations.

Both Winn and the government agree that 18 U.S.C. § 3282(a), which establishes a five-year statute of limitations for most federal crimes, applies.  Under 18 U.S.C. § 3282(a), an indictment for a non-capital offense must be brought within five years "after such offense shall have been committed."  *Id.*

Ordinarily, the statute of limitations begins to run when the crime is complete.  *See Toussie,* 397 U.S. at 115.  A crime is complete when each element of the crime has occurred. *United States v. Smith*, 740 F. 2d. 734, 736 (9th Cir. 1984).  Courts deciding when the statute of limitations begins to run in a given case must consider the purposes of the statute of limitations. *Toussie,* 397 U.S. at 114.  A statute of limitations limits exposure to criminal prosecution to a fixed period of time following the occurrence of acts the legislature has decided to punish by criminal sanctions.  *Id.*  It is designed to protect individuals from having to defend themselves against charges when facts may have become obscured by the passage of time.  *Id.*  It minimizes the danger of punishment for acts in the distant past and "may also have the salutary effect of encouraging law enforcement officials promptly to investigate suspected criminal activity."  *Id.* at 114-15.  For these reasons, the Supreme Court has held that statutes of limitations should be liberally construed in favor of repose, and they normally begin to run when the crime is complete.  *Id.*

Winn argues that the government cannot prosecute him for any claim submitted before July 31, 2008—five years before the grand jury returned the Indictment in this case.  The government concedes that the Indictment alleges the violations occurred on the dates Medicare *paid* Desert, but the healthcare fraud violations occurred when fraudulent claims were *submitted* to Medicare.

/ / /

Counts one through five allege fraudulent claims paid by Medicare between November 27, 2007, and April 14, 2008.  The government's supplement indicates these claims were received by Noridian between November 21, 2007, and April 10, 2008.  The Indictment, the government's response to the motion, and the government's supplement do not indicate whether the government knows when the claims were submitted, which the government acknowledges is the "operative date" for each violation.  Counts one through five occurred more than five years before the Indictment was returned on July 31, 2008.  These counts are therefore time-barred unless the crime of healthcare fraud is a continuing offense which effectively extends the statute of limitations until the last fraudulent submission was made.

Counts six through nine of the Indictment allege fraudulent claims were paid by Medicare within five years of July 31, 2013.  The government's supplement states the claims were received by Noridian on August 3, 2013.  Again, the government does not indicate when these claims were submitted to Medicare.  If they were submitted to Medicare prior to July 31, 2008, the crimes charged in counts six through nine are time-barred unless the crime of healthcare fraud is a continuing offense.

Counts ten and eleven of the Indictment allege fraudulent claims were paid by Medicare on August 27, 2008.  The government's supplement indicates the claims were received by Noridian on August 24, 2008.  Once, again, the government does not indicate when these claims were submitted to Medicare, which the government acknowledges is the operative date for the violations.  Given that these claims were paid within three days of receipt, it seems reasonable to infer they were submitted after July 31, 2008.  In a footnote to the government's supplement, the government states that because the claims were submitted electronically "the date of receipt by Medicare is approximately equal to the date of submission."  The government has offered to provide the underlying documents to counsel for the Defendant for his review.  However, when the claims were actually submitted to Medicare is a factual issue which the court cannot decide based on the moving and responsive papers presented in connection with this motion.

/ / /

/ / /

C.      The Continuing Offense Doctrine

In 1939, the Supreme Court defined a continuing offense as "a continuous, unlawful act or series of acts set on foot by a single impulse and operated by an unintermittent force, however long a time it may occupy."   *United States v. Midstate Horticultural Co.*, 306 U.S. 161, 166 (1939) (internal citation and quotation omitted).  A continuing offense "is a term of art that does not depend on everyday notions or ordinary meaning."  *United States v. Reitmeyer,* 356 F.3d 1313, 1321 (10th Cir. 2004).  The continuing offense doctrine is an exception to the general rule that a crime is complete, and the statute of limitations begins to run, as soon as every element of the crime has occurred.  If a crime is a continuing offense, the statute of limitations does not begin to run until the last act of the offense. *Black's Law Dictionary,* 1186 (9th ed. 2009).

Until 1970 when the Supreme Court decided the landmark case of *Toussie v. United States,* the lower courts had little guidance on the test for identifying a continuing offense.  In *Toussie,* the Supreme Court examined the relationship between the continuing offense doctrine and the statute of limitations and formulated a two-part test to determine when an offense should be considered continuing for statute of limitations purposes.

D.      The *Toussie* Test

*Toussie* held that a crime is a continuing offense only where: (1) the explicit language of the criminal statute compels such a conclusion; or (2) the nature of the crime is such that Congress "must assuredly have intended" that it be treated as a continuing one.  *Toussie*, 397 U.S. at 115.  Conspiracy is the classic example of a continuing offense. *Id.* at 122.  A conspiracy continues as long as the conspirators engage in overt acts in furtherance of their conspiracy.  *Id.* A conspiracy meets the second prong of the *Toussie* test for a continuing offense because "the nature of a conspiracy is such "that each day's acts bring a renewed threat of the substantive evil Congress sought to prevent." *Id.*

*Toussie* involved a prosecution and conviction under the Universal Military Training and Service Act and implementing regulation.  Under the Act, male citizens between the ages of eighteen and twenty-six were required to register for the draft, and a presidential proclamation required eligible men to register within five days of turning eighteen.  Toussie was required to

register between June 23 and 28, 1959, but did not do so.  He was indicted on May 3, 1967, convicted and appealed, arguing that his crime was complete in 1959, and his prosecution barred by the statute of limitations.  The government agreed that the crime was complete in 1959, but argued that the crime continued to be committed each day Toussie failed to register.

The Supreme Court reversed Toussie's conviction, holding that neither the Act, nor the implementing regulation, imposed a continuing duty to register.  As a result, the crime was complete, and the statute of limitations began to run, five days after Toussie's eighteenth birthday.  The opinion relied on a line of cases holding that criminal statutes of limitations should be liberally construed in favor of repose and normally begin to run when the crime is complete.  *Id.* at 115.  The doctrine of continuing offenses should only be applied in limited circumstances when "the explicit language of the substantive criminal statute compels such a conclusion, or the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one."  *Id.*

The regulation in *Toussie* contained language that the duty to register "shall continue at all times," and the Supreme Court acknowledged that this language "admittedly might be construed" as the government argued.  *Id.* at 116.  Although the regulation referred to registration as a continuing duty, the Supreme Court found that there was no language in the statute itself that clearly indicated the failure to register was a continuing duty.  The Supreme Court exhaustively examined the history of the Act, its predecessor statutes, and the implementing regulations in reaching its conclusion that the Act was not intended to treat continued failure to register as a continuing offense.

Tracing various draft acts from World War I, the Supreme Court found that it was "clear that throughout the administration of the first draft law, registration was thought of as a single, instantaneous act to be performed at a given time, and failure to register at that time was a completed criminal offense."  *Id.* at 117.  The Supreme Court concluded that the statute itself, apart from the administrative regulation, did not require it to be construed as a continuing offense.  *Id.*  Congress did not explicitly define the failure to register as a continuing offense and in these circumstances, the Court should not choose the harsher alternative which would

11

1   effectively extend the statute of limitations until as late as thirteen years after the crime was first

2   complete. *Id.* at 122.

3           **E.     Continuing Offenses**

4                   **1.      *Toussie's* Test First Prong: Explicit Congressional Language**

5           Congress has explicitly created continuing offenses in a number of criminal statutes.   In

6   22 U.S.C. § 618(e), Congress provided that the failure to register as a foreign agent within ten

7   days is a continuing offense.    Congress also explicitly provided that concealment of a

8   bankruptcy's assets is a continuing offense in 18 U.S.C. § 3284 and provided that the statute of

9   limitations "shall not begin to run until such final discharge or denial of discharge."   Congress

10  has not explicitly designated most federal criminal statutes as continuing offenses.   However, a

11  body of federal common law has developed finding certain federal offenses are continuing

12  violations.

13                  **2.      The *Toussie* Test Second Prong: Crimes Congress "Must Assuredly
                    Have Intended" to be Continuing Offenses**

14          Federal courts have held that escape, kidnapping and crimes of possession are continuing

15  offenses.   The federal kidnapping statute is a continuing offense because the crime continues as

16  long as the victim is held.   *See United States v. Garcia*, 854 F.2d. 340, 343-44 (9th Cir. 1988).

17  The purpose of the federal kidnapping statute is to protect the victim not only from forceable

18  abduction but from the continuing harm of confinement and continued detention.   *Id.*   The

19  essence of the offense is the involuntariness of the seizure and detention.   *Id.*   As a continuing

20  offense, the statute of limitations for kidnapping does not begin to run until the victim ceases to

21  be held.   *Id.*

22          The Supreme Court has held that an escape from federal custody under 18 U.S.C.

23  § 751(a) is a continuing offense and that an escapee can be held liable for failure to return to

24  custody as well as for his initial departure.   *United States v. Bailey*, 444 U.S. 394, 413 (1980).

25  Escape is a continuing offense because of the continuing threat to society posed by an escaped

26  prisoner.   *Id.*   In *Bailey,* the Supreme Court found that because of the continuing threat to society

27  posed by an escaped prisoner Congress "must assuredly have intended" that escape be treated as

28  a continuing offense.   *Id.* (citing *Toussie*, 397 U.S. at 115).   The defendant argued that *Toussie*

1  calls for restraint in labeling crimes as continuing offenses.  The Supreme Court found that the

2  justification for the restraint "is the tension between the doctrine of continuing offenses and

3  policy of repose embodied in statutes of limitations." *Id.* (citing *Toussie,* 397 U.S at 114-15).

4  However, under 18 U.S.C. § 751(e), the statute of limitations is tolled for the period that the

5  escapee remains at large, and therefore "[t]his tension is wholly absent." *Id.* at 413-14.

6      Federal crimes of possession have also routinely been held to be continuing offenses. *See*

7  *United States v. Krstic*, 558 F.3d. 1010, 1017 (9th Cir. 2009).  *Krstic* involved a prosecution

8  under 18 U.S.C. § 1546(a) for obtaining an alien registration card by means of a false statement.

9  The section under which Krstic was prosecuted prohibited possession of an otherwise authentic

10  document that one knows has been procured by means of a false claim or statement.  Krstic

11  appealed his conviction, arguing the prosecution was barred by a five-year statute of limitations

12  because the false statement was made more than five years before the indictment was returned.

13  The Ninth Circuit found Krstic was charged with a possessory offense, not a false statement

14  offense.   In possessory offenses, the statute of limitations does not begin to run until the

15  possessor parts with the contraband.

16      The Ninth Circuit has held a number of offenses qualify as continuing offenses. *See*, *e.g.,*

17  *Eichelberger v. United States*, 252 F.2d. 184 (9th Cir. 1992) (holding an offense of illegal

18  possession of firearms in violation of 18 U.S. C. §§ 5811–5814 is a continuing offense because

19  the offense began on the date the guns were received by the defendant and continued until the

20  date set forth in the indictment); *United States v. Kayfez*, 957 F.2d. 677, 678 (9th Cir. 1992) (per

21  curiam) (holding the crime of possession of counterfeit notes under 18 U.S.C. § 472 is a

22  continuing offense because the defendant possessed the counterfeit notes continuously from the

23  time he made them until they were seized); *United States v. Gray*, 876 F.2d. 1411, 1418 (9th Cir.

24  1989), *cert. denied*, 495 U.S. 930 (1990) (holding failure to appear for sentencing in violation of

25  18 U.S.C. § 3146(a) is a continuing offense because of the danger to society posed by having

26  convicted criminals at large); *United States v. Merino*, 44 F.3d. 749, 754 (9th Cir. 1994) (holding

27  a violation of 18 U.S.C. § 1073 for unlawful flight to avoid prosecution is a continuing offense

28  / / /

because of the "threat to the integrity and authority of the court" posed by a defendant who refuses to abide by lawful court orders).

None of these crimes meet the first prong of the *Toussie* test because Congress did not include explicit language in the statutes themselves proclaiming the offenses were continuing offenses.   The Ninth Circuit has determined that these crimes are continuing offenses by applying the second prong of the *Toussie* test, which examines the nature of the offense itself. Once committed, these crimes continue until they are affirmatively ended, i.e. until the kidnapped victim is returned; the escaped prisoner, defendant failing to appear, or person fleeing prosecution is apprehended; or the person no longer possesses contraband.

The Ninth Circuit has not yet decided whether a healthcare violation under 18 U.S.C. § 1347 is a continuing offense.  The government argues that because the healthcare fraud statute is modeled after the bank fraud statute, and the Ninth Circuit has held that bank fraud is a continuing offense, the crime of healthcare fraud is a continuing offense.   The government contends that a healthcare fraud crime is not completed until the last fraudulent submission to Medicare is made.

The mail fraud, wire fraud, bank fraud, and healthcare fraud statutes are all similarly structured and use nearly identical language.  The mail fraud statute provides in pertinent part, "Whoever, having devised or intending to devise any scheme or artifice to defraud, . . .places in any post office or authorized depository for mail matter, any matter or thing to be sent or delivered by the Postal Service . . . shall be fined . . . or imprisoned . . . ." 18 U.S.C. § 1341.

The wire fraud statute provides in pertinent part, "Whoever having devised or intending to devise any scheme or artifice to defraud, . . .transmits or causes to be transmitted by means of wire, radio, or television communications . . .any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined . . . or imprisoned . . . ." 18 U.S.C. § 1343.

The bank fraud statute provides in pertinent part, "Whoever knowingly executes or attempts to execute a scheme or artifice – (1) to defraud a financial institution; or (2) obtain any

/ / /

of the monies . . . of a financial institution, by means of false or fraudulent pretenses, or representations, or promises; shall be fined . . . or imprisoned . . . ." 18 U.S.C.§ 1344.

The healthcare fraud statute provides in pertinent part, "Whoever knowingly or willfully executes, or attempts to execute, a scheme or artifice . . . to defraud any healthcare benefit program . . . in connection with the delivery of or payment for healthcare benefits, items or services, shall be fined . . . or imprisoned . . . ." 18 U.S.C. § 1347.

All of these statutes contain the same "scheme or artifice to defraud" language.  The bank fraud and healthcare fraud statutes prohibit executions or attempted executions of a scheme or artifice due to fraud.  The mail fraud statute prohibits placing fraudulent materials in the mail.  The wire fraud statute prohibits transmitting fraudulent materials electronically.  The *mens rea* requirements are also different.  The bank fraud statute requires a proof of a knowing execution or attempted execution.  The healthcare fraud statute requires a knowing and willful execution or attempted execution.

In *United States v. Niven*, 952 F.2d. 289 (9th Cir. 1991), *overruled on other grounds by United States v. Scarano,* 76 F.3d 1471, 1477 (9th Cir. 1996), the Ninth Circuit held that the offenses of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 were not continuing offenses in the context of a sentencing guideline issue.  Citing *Toussie*, the Ninth Circuit acknowledged the doctrine of continuing offenses should only be applied in limited circumstances.  *Id.* at 293.  Applying *Toussie*, the Ninth Circuit determined that the crimes of mail fraud and wire fraud criminalize each specific use of the mail or wire and that each offense is complete when the fraudulent matter is placed in the mail or transmitted by wire.  The *Niven* court acknowledged that "the analysis turns on the nature of the substantive offense, not on the specific characteristics of the conduct in the case at issue." *Id.*  However, the decision did not provide an analysis or rationale for its holding that mail and wire fraud criminalize each specific use of the mail or wire and are completed when the fraudulent matter is placed in the mail or transmitted by wire.

The *Molinaro* decision relied upon by the government by analogy found that the bank fraud statute punishes each execution of a fraudulent scheme rather than each act in furtherance

15

of such a scheme. *United States v. Molinaro,* 11 F.3d. 853, 859 (9th Cir. 1993).  Molinaro was convicted of thirty-one counts of bank fraud and conspiracy to defraud the United States in making false entries in the books of a federally-insured savings and loan he owned.  He and his co-defendant appealed the convictions on three grounds: (1) the evidence was insufficient; (2) proof at trial constituted an amendment or variance from the indictment; and (3) the counts were multiplicitous.  The defendants argued that counts one through thirty of the indictment were steps in the same scheme to defraud and were, therefore, multiplicitous.  The Ninth Circuit concluded that the form of the indictment and individual counts reflected the government's view that each act in furtherance of the overall scheme to defraud the bank constituted a separate violation of § 1344.  The Ninth Circuit noted that the government's view had been rejected by the First and Fifth Circuits, which had each held that each execution of a scheme to defraud a financial institution, rather than each act in furtherance of a scheme to defraud, constitutes a violation of § 1344.  *Id.* at 859.  The government argued that the Ninth Circuit holding in *United States v. Poliak*, 823 F.2d 371, 372 (9th Cir. 1987), that the mail fraud statute, which criminalizes each use of the mail in furtherance of a scheme to defraud, should be applied to the bank fraud statute.

Poliak was charged with bank fraud by a check kiting scheme.  Each count of the indictment charged the kiting of a separate check.  *Poliak* held that § 1344 allowed charging the execution of the scheme to defraud as a separate act, and that each check kiting transaction constituted "a different and separate execution of the scheme to defraud banks."  *Id.* (citing *Poliak*, 823 F.2d at 372).  *Molinaro* reaffirmed the Ninth Circuit's holding in *Poliak* "that the unit of the offense created by § 1344 is not each act in furtherance of the scheme to defraud, but each execution or attempted execution of the scheme to defraud."  11 F.3d at 860.  The *Molinaro* court then turned to the obvious question of what constitutes an execution of the scheme and concluded that it "depends on the particular facts of each case."  *Id.*  The Ninth Circuit affirmed the conviction but remanded for resentencing because, although the government's proof at trial was sufficient on each of the counts, some of the counts charging a scheme to defraud under § 1344 were multiplicitous.  *Id.* at 864.  It directed the district court to resentence the defendant,

indicating that a sentence could be imposed on each count for each execution of the scheme, but it had to be run concurrently with each sentence on a count that was part of the same execution.

In *United States v. Nash*, 115 F.3d. 1431, 1441 (9th Cir. 1997), the Ninth Circuit held that a violation of 18 U.S.C. § 1344 for bank fraud is a continuing offense.  *Nash* was also a sentencing guideline case.  The Ninth Circuit reasoned that bank fraud punishes the execution of a scheme to defraud or obtain money, which is language that suggests the violation should be treated as a continuing one.  The *Nash* decision acknowledged that *Niven* held that mail and wire fraud could not be continuing violations because these offenses punish each use of the mail or wires.  *Nash* concluded that, by contrast, a § 1344 violation "involves the execution of the overall scheme," but the court did not articulate its rationale for this conclusion.

In *United States v. Najjor*, 255 F.3d. 979 (9th Cir. 2001), the Ninth Circuit addressed whether defrauding a bank in violation of 18 U.S.C. § 1344 was a continuing offense for purposes of the statute of limitations.  Najjor was charged and convicted of two counts of bank fraud for defrauding two different financial institutions.  He challenged his conviction on one of the counts of bank fraud on statute of limitations grounds.  The Ninth Circuit recognized that the statute of limitations normally begins to run when the crime is complete.  *Id.* at 983.  The defendant argued that all of the acts constituting the crime of bank fraud were committed prior to December 2, 1996, when the loan was approved because by then, all of the false documents had been submitted which put the bank at risk.  However, because Najjor signed a loan note on December 11, 1986, in furtherance of the bank fraud scheme within in the ten-year statute of limitations, the Ninth Circuit held that the indictment was returned within the statute of limitations, and the government could prosecute him for the entire scheme to defraud the bank. *Id*. at 983-84.

It is difficult to understand the Ninth Circuit's rationale for holding that bank fraud is a continuing offense, but mail and wire fraud offenses are not.  The Supreme Court has held that the purpose of the mail and wire fraud statute is to prevent the use of the post office and communications media as a means to effectuate fraud.  *See Parr v. United States*, 363 U.S. 370, 389 (1960).  *Niven* did not cite *Parr* but relied on the second prong of the *Toussie* test in reaching

its holding.  The *Niven* court acknowledged that under *Toussie,* "the analysis turns on the nature of the substantive offense, not on the specific characteristics of the conduct in the case at issue."  952 F.2d at 293.   It concluded, without explaining, that "the offenses at issue--18 U.S.C. §§ 1341 and 1343--criminalize each specific use of the mail or wire.  Each offense is complete when a fraudulent matter is placed in the mail or transmitted by wire, respectively." *Id.*

Nash and *Molinaro* do not expressly articulate what it is about the nature of the offense of bank fraud that makes it meet the second prong of the *Toussie* test, an offense such that Congress "must assuredly have intended" be treated as a continuing one.  The rationale seems to be that the bank fraud statute criminalizes a scheme to defraud in contrast to the mail fraud and wire fraud statutes, which criminalize each use of the mail and wire.  However, as noted, all three statutes have the same language prohibiting a scheme or artifice to defraud.

None of the Courts of Appeals have addressed whether healthcare fraud is a continuing offense.  One published and two unpublished district court decisions have held that healthcare fraud is a continuing offense.  *See United States v. Mermelstein*, 487 F. Supp. 2d. 242, 255 (E.D.N.Y. 2007); *United States v. Schickle*, 2010 WL 2680856 at *1 (D. Me July 1, 2010); *United States v. Refert*, 2007 U.S. Dist. LEXIS 548 at *6 (D.S.D. Jan. 3, 2007).  Each of these decisions is based on fraudulent scheme analysis.  In *Mermelstein*, the defendant was charged with one count of healthcare fraud, and the court held that the statute of limitations did not bar a prosecution for conduct that took place more than five years before the indictment was filed.  The court reasoned that the indictment defined a single scheme to defraud healthcare benefits programs though an ongoing pattern of criminal behavior, and the scheme was perpetrated in essentially the same manner throughout the period charged in the indictment.  As a result, the submission of various fraudulent claims was properly charged as a single continuing offense that was not completed until after the healthcare fraud statute was enacted and was well within the statute of limitations.  487 F. Supp. 2d. at 255.

Schickle concluded that "a violation of 18 U.S.C. § 1347 requires the development and execution of a scheme to defraud and, thus, is properly charged as a continuing offense."  2010 WL 2680856 at *1.  The *Schickle* court was persuaded by the government's argument which

relied on the similarities between the healthcare fraud statute and the bank fraud statute and the defendant's failure to offer any reason why the bank fraud cases should not be applied to the healthcare fraud statute.

*Refert* applied the Ninth Circuit's holding in *Nash,* which suggested that healthcare fraud should be treated as a continuing offense. *Refert* acknowledged that the healthcare fraud statute is modeled after the bank fraud statue, and that the bank fraud statute was modeled after the federal mail and wire fraud statutes. It did not address or analyze how bank fraud could be a continuing offense, but the mail and wire fraud statutes on which it was modeled are not. *Refert* also found that the nature of the healthcare fraud charged in the indictment, which involved the defendant going to a facility and representing she was eligible for healthcare services and continuing to present for healthcare services, was a continuing crime.

In this case, the government does not claim that Congress expressly proclaimed that a violation of § 1347 is a continuing one, and nothing in the plain language of the statute itself compels such a conclusion. The first prong of the *Toussie* test has clearly not been met. The court must therefore determine whether the nature of a § 1347 violation is such that Congress "must assuredly have intended" that it be treated as a continuing violation. The government contends that the healthcare fraud is a continuing offense that does not cease until the last execution of the fraud occurs, that is, until the last fraudulent claim is submitted to Medicare. The government seems to argue that healthcare fraud punishes a scheme to defraud, like the bank fraud statute, and each execution of the scheme may be separately charged. The government maintains that because healthcare fraud is a continuing offense, it may charge all eleven counts as long as the last false submission fell within the five-year statute of limitations.

The government did not charge this as a single one-count scheme to defraud over a period of time. Rather, the government brought an eleven-count Indictment for each fraudulent submission made to Medicare. However, even if the government had charged this as a single-count scheme occurring over a period of time, the court would still be required to apply the *Toussie* test to determine whether healthcare fraud is a continuing offense such that the

/ / /

government may prosecute conduct occurring more than five years before the Indictment was returned.

As *Toussie* makes clear, the second prong of the test focuses on whether the nature of the crime of healthcare fraud is one that Congress "must assuredly have intended" that it be treated as a continuing violation, not the conduct charged in the Indictment.

*Toussie* found the crime of failing to register for the draft was not a continuing offense even though the regulation contained language that could have been interpreted as a continuing offense language.  It comprehensively examined the history of the Act and its predecessor statutes finding that the failure to register had always been regarded as an instantaneous event.  It also found that although the statute could be interpreted as the government argued, where two interpretations were possible, the court should not pick the one that has harsher consequences on a criminal defendant.

Both prongs of the *Toussie* test focus on the intent of Congress, *i.e.*, whether Congress used explicit language proclaiming the offense a continuing one, or, "must assuredly have intended" that the crime be treated as a continuing offense because of the nature of the offense itself.  The cases that rely upon the conduct charged in the indictment to determine whether a statute is a continuing violation stray from the second prong of the *Toussie* test, which requires the court to focus on the nature of the crime (statute) itself, not the conduct charged, that is, the conduct alleged to violate the statute.

The continuing offense doctrine extends the statute of limitations for a category of crimes that continue to cause harm to society at large or individual victims until the crime is terminated—that is, when the escapee is apprehended or turns himself in, when the kidnapped victim is released, or when the last act in furtherance of a conspiracy ceases.  The modern trend seems to expand the doctrine for fraud-type violations by focusing on the conduct charged in the indictment rather than the crime itself by considering the offense as part of a continuing fraudulent scheme.  However, *Toussie* teaches that it is the nature of the crime, not the conduct charged, that determines if the crime is a continuing offense.  The Ninth Circuit recognized this

/ / /

1    in *Niven* when it stated "the analysis turns on the nature of the substantive offense, not the

2    specific characteristics of the conduct in the case at issue."  952 F.2d at 293.

3          The statute of limitations normally begins to run when the crime is complete, *i.e.,* when

4    each element of the crime has occurred.  *United States v. Smith*, 740 F.2d at 736.  The Supreme

5    Court has directed that statutes of limitations are to be construed liberally in favor of repose, and

6    the continuing offense doctrine should be applied only in limited circumstances.  *Toussie*, at 115.

7    The Ninth Circuit has not yet held whether the crime of healthcare fraud is a continuing offense.

8    The statute contains no language expressly proclaiming a § 1347 violation as a continuing

9    offense, and the government does not contend it does.  Congress knows how to declare an

10   offense a continuing offense and has done so in the past.  The court must therefore apply the

11   second prong of the *Toussie* test to determine whether the crime of healthcare fraud is one that

12   Congress must assuredly have intended to be treated as a continuing one.

13         The government argues that the conduct charged in the Indictment was continuous, and

14   therefore, the crimes were not complete until the last false submission was made to Medicare.

15   However, focusing on how the government alleges Winn committed the offense, rather than on

16   the nature of the statute itself, would largely eviscerate the second prong of the *Toussie* test.

17   *Toussie's* holding requires the court to examine *congressional* intent, not the individual conduct

18   charged in the case before the court.

19         The court finds that there is nothing about the nature of the crime of healthcare fraud that

20   makes it a continuing offense under the second prong of the *Toussie* test.  The court finds that the

21   offense punishes a knowing, willful execution, or attempted execution, to defraud a healthcare

22   benefits program.  The crime is complete, and the statute of limitations begins to run, when the

23   false or fraudulent claim is submitted for payment.  Thus, counts one through five of the

24   indictment are barred by the five-year statute of limitations as they clearly occurred more than

25   five years before the Indictment was returned on July 31, 2013.

26         The court cannot determine from the information provided in the moving and responsive

27   papers whether the remaining counts are time-barred because the government has not provided

28   sufficient information for the court to determine when the claims were submitted for payment.

The Indictment alleges that the false claims alleged in counts six through nine were submitted on August 6, 2008, and the government's supplement reports the claims were received electronically by the third-party administrator for Medicare on August 4, 2008.  If the claims were submitted before July 31, 2008, they are time-barred.  If they were submitted on or after July 31, 2008, they are not.  The same is true with respect to counts ten and eleven, which were paid by Medicare on August 27, 2008, and received by Noridian, the third-party administrator for Medicare, on August 24, 2008.

**CONCLUSION**

Every statute of limitations may permit a rogue to escape.  *See Pendergast v. United States*, 317 U.S. 412, 418 (1943).  However, the Supreme Court has directed courts deciding when a statute of limitations begins to run to consider the purposes of the statute of limitations.  Criminal statutes of limitations are to be liberally interpreted in favor of repose and normally begin to run when the crime is complete.  The Supreme Court has clearly held that the doctrine of continuing offenses should be applied only in limited circumstances.  In this case, both sides agree that the five-year limitations period established by 18 U.S.C. § 3282 applies.  The government does not contend that the first prong of the *Toussie* test has been met.  Applying the second prong of the *Toussie* test, the court finds that there is nothing about the nature of the crime of healthcare fraud that indicates Congress must assuredly have intended that it be a continuing offense.

For the reasons stated,

**IT IS RECOMMENDED** that Winn's Motion to Dismiss (Dkt. #32) be **GRANTED in part** and **DENIED in part**.  The motion should be GRANTED to the extent that counts one through five of the Indictment should be DISMISSED as time-barred.  A decision on the remaining counts should be DEFERRED until trial when the record is fully developed concerning when the allegedly false claims charged in counts six through eleven of the Indictment were allegedly submitted to Medicare.  Any claims submitted prior to July 31, 2008,

/ / /

/ / /

five years before the Indictment was returned on July 31, 2013, should be DISMISSED as time-barred.

DATED this 21st day of July, 2014.

PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE